Our second case for this morning is United States v. Lonnie Whitaker. Mr. Eisenberg. Thank you. May it please the Court? I'm Mark Eisenberg, and I represent Lonnie Whitaker in this matter. In order for you to uphold the Court's position in this case, you have to come up with two you have to uphold two premises. The first is that these dogs are infallible. And second, that tenants in a security-locked apartment building do not have any expectation of privacy in their hallways. Don't we have to first think about what the Supreme Court was talking about in Florida against Jardines? Oh, I agree, we do. Because that's a physical... Justice Scalia says in that opinion, maintaining the original notion of the sanctity of the curtilage, he says, keeps easy cases easy. And he quite specifically does not go down the cat's reasonable expectation of privacy path. Some of the concurring justices might have done that, but that's not what a majority of the Court did. Now, this Court has held a number of times that apartment hallways and foyers and that sort of area are not part of the apartment. It's an area that's widely used by lots of people, whether it's maintenance staff or visitors or random people walking down, you know, the manager walking down the hall, friends of others. So I am not sure why having the dog in the apartment hallway is a big problem. Well, I think that the trespass idea and the expectation of privacy are very intertwined. But not in Jardines. I took a special extra look at it this morning. Maybe I read Gutierrez wrong in this circuit. But when I read Gutierrez, if I can find my notes here, it said that Jardines holding is that the use of a drug dog on the defendant's porch is a Fourth Amendment violation based on the implied license theory. Because the Court doesn't get to that. That's an accurate statement of Jardines. But you have to first get, if you will, inside the protected physical area, which is the house and the curtilage. Once you're inside, then there are, as you I'm sure well know, there are a variety of theories that might make it okay. There might be express consent. There might be an implied license. There might be other things. But it's still part of the Court's physical theory of the Fourth Amendment here. Don't you think that someone in a security lock department building would have more of an expectation of privacy in the hallway and that somebody coming up and knocking on their door, they wouldn't expect that than in the house. But you're still using the cats rubric. And I'm not sure that helps you. Unless our Court is wrong, which we certainly wouldn't be the first time, but if an apartment building hallway is not within the curtilage of the apartments that have bought it, then it can be, you know, a police officer can walk down the hallway. Somebody's favorite cat can walk down the hallway. A dog can walk down. I understood your position to be not that the police were trespassing. They were entitled to be there. They were entitled to walk a dog down the hall. But they're not entitled to do the equivalent of what happened in Jardine, which is walk the dog right by for purposes of a search. There was a Sixth Circuit case that came down about in 2000, I think it's Harmon, where police went into a security lock department building uninvited, and the Sixth Circuit threw it out and said you can't do that because you were trespassing. Here, the argument the police have as well, the building manager let me in. I guess I look at the hallway as saying, is there an unlimited purpose for that hallway? The purpose for the hallway is to ingress and egress. That's the purpose. That's if I'm sitting in my apartment, that's what I would expect it to be used for. I wouldn't expect it to be a dog park. I wouldn't expect it to be a place where children can play in the hallway. Or to have police officers put a stethoscope to the door and listen to what's going on inside. Exactly. I wouldn't expect that. And I know that Justice Alioto in, I think it was Jardines, it might have been Harris, talked about, well, they could just do that from the street, and how is that any different? The problem is the dog can't alert from the street. The dog has to be closer than that. And that's the difference. I don't think there's an unlimited use of that hallway. And specifically, the common custom would be that I'm not going to bring a dog up and down that hallway to search for intricate activities that occur inside the apartment. And that's why I guess I disagree with you, Your Honor. Well, I mean, I'm just trying to look at Jardines. Obviously, that's what we're sitting here for. Mr. Eisenberg, is it correct if the police had just gone up to the door and had themselves smelled marijuana smoke, there's no problem with that, is there? I think that under the common custom, a police officer go and do a knock and talk, although in a security-locked apartment, really I wouldn't expect it. The answer I take it is yes. I think that would be different, yes, sir. But we're using, you know, I don't want to get into Kylo, but I do think they're analogous, and the district court didn't. And I know other courts haven't as well. You're using an extrasensory machine, the dog, to look at things that are inside the apartment or smell things that are inside the apartment, similar to Kylo. And we don't know whether the dog is actually alerting on the contraband because that goes back to my whole thing about these dogs are not infallible. They don't need to be infallible. Actually, the only thing the dog is being used for is to contribute to the finding. It wasn't the only piece of evidence. To contribute to the probable cause that is found for the warrant. I disagree with you there, too, because the government already conceded without the dog there isn't any probable cause. Well, it contributes significantly, but that's what the dog is being used for. The dog isn't searching the apartment. The dog is being brought before the issuing magistrate. But, Your Honor, it really all goes down to the reliability of that dog because the dogs get a pass. Justice Souter alluded to this. But a lot of your cases are not warrant cases. They're warrantless search cases. No, but okay, then if we're going to go that route, the informant, the dog is like an informant. And we look at the dog's reliability based on the totality of circumstances that we use to investigate or challenge informants. So what does that mean? Well, we look at these factors. The government agrees with you on this informant analogy. I think it's partly good, partly really not. I mean, the dog is just smelling things. But what's it smelling? See, this is my whole thing about dogs. Can I maybe quibble a little bit with what you said a moment ago? Analogizing to Jardine, you said the dog is being able to detect something that's occurring in the apartment. Hair splitting, but the reality is the dog is detecting an odor in the common element. You're drawing an inference that if there's an odor in the common element, it may be emanating from the door next to where the odor is coming from. But Jardine had a device that actually allowed it to make some determinations as to what was occurring inside the premises. I think that's exactly what the dog is doing. It's saying there's an odor in the inside. No, the dog's saying there's an odor outside. Okay, and how do we know that that odor came from apartment 204? How do we know it didn't come from apartment 208 or 206? Because the dog alerted to 204. Well, that's a whole other issue about human. It's the reliability of the dog, I guess. So you understand my position about the reliability of dogs. And Justice Souter said that in Cabalas. It's a legal fiction. These people get away with so much with these dogs, it's unbelievable. And the only way you can see that is to look at what does Harris say? The dog – no, I lost my train of thought. I'm sorry. You can correct your thoughts. About the reliability of the dog. Yeah, no, we understand that. And we've had a number of cases that have been argued about the reliability of various dogs. So they're valuable. They can be cued as what happened here. And then they get the free pass all the time on things like, well, for example, the Escalade in this case. There weren't any drugs in the Escalade. Now I know the government's going to get up and say, well, there were drugs. How did they get from Milwaukee to his apartment? They had to come in the Escalade. But you don't know that. But the dogs get a pass on that. They get justified for their error. So then the question becomes when – Let's not overstate it. I mean, there are tests. There are certifications. The dogs – there's some evidence in the record, usually, this case not being an exception, that the dog is alerting when he should be. Yes, but, again, you don't know what the dog is alerting to. Would you comment on the government's assertion that, absent the dog, there still was probable cause for that warrant? No, the government says there isn't. They conceded that, without the dog, all the other information, I assume, is what my argument was, is that the information was stale and it was too long ago. And that's why they needed the dog, and that's why they made all these arrangements to get into the dog. It does corroborate, though. You've got the informant. You've got other – it's not just the dog. But it's stale. And, you know, when you talked about alerting, if I could go back to that for a second, the dog walks through the hallway. And, of course, according to the police officer, the handler, well, he would have alerted at 2.04, but I want to take him up and down the hallway first. Well, if he went up and down the hallway first, why is it that that dog stopped at 2.08 and alerted right there? Because the dog didn't alert at 2.04. And there's no proof whatsoever that that dog would have ever gone anyplace else unless it was directed by Detective Wagner, who is not the handler, to say to the handler, oops, hey, that's the wrong apartment. I don't know. I mean, another way of looking at that, certainly the dog alerts at 2.08, no doubt about that. Now, why the dog alerted at 2.08 in the moment is not clear. We, after the fact, discover that this reverend lives there who swears that he's never seen drugs, fine. Right. But there are a lot of apartment buildings that I can think of in the city of Chicago where there might be more than one apartment that would have an odor of drugs around it. That's just a fact. No doubt. So the fact that the dog alerts on one apartment, in the mind of the police officer in the moment, doesn't necessarily mean that that's the only apartment on the corridor where there are drugs. Certainly true. But don't you think that the neutral and detached magistrate who is signing the affidavit or signing the search warrant should have known that fact? Because the dog had- What are you going to tell the guy? That maybe there were two apartments with drugs? No. Because I don't think the police knew enough at the time to say that it was a false alert on 2.08. No doubt about it. The problem here is the Q. The 2.08 alert may have been false. It may have been correct. Nobody knew at the time. But when you've got the investigator telling the dog handler wrong apartment, that's certainly something I would want to know if I were being asked to issue a search warrant. I agree wholeheartedly. And that was the opportunity that we never got to challenge in front of the magistrate. Is there a legitimate reason for not telling the magistrate that, that you can think of? Yeah. He was concerned that it would affect the dog's reliability. I said legitimate reason. He had a legitimate reason? Yeah. No, not that I could think of. I would say that he had three days to investigate, and he told the handler he was going to do that. And the handler thought it was important enough to put it in his report, so Detective Wagner, when he applied for the affidavit for the search warrant, didn't think it was that important. If you'd like to save a little time for rebuttal, you can do that. Sure, that would be fine. Thank you very much. All right. Maybe, Ms. Rumbleau, you should start with Judge Hamilton's last question. Why keep this information from the issuing magistrate when there's even a cue about, oops, you know, it's not 208 we're interested in, let's keep going?  We could add the information that the dog also alerted to apartment 208. No, the key point is not that. The key point is the cue, wrong apartment. Okay, but, again, if we add all that information, put it in the warrant affidavit, does that detract from the probable cause to search apartment 204? It doesn't. Oh, yes, absolutely it does, because what it tells you is that the dog was not acting in an uncued, objective way, and that he was getting signals. At least you'd want to find out more about it if you were the issuing magistrate. I think the information that would have been added would have included the fact that the dog did try to alert on 204 right away, so that adds to probable cause. And so why not tell the magistrate judge any of this? I understand your argument, oh, we've still got probable cause. I disagree, but why not tell the judge that? But for a Franks hearing, that's the standard. Why not? I don't know why they didn't. I don't know why they didn't, but the standard is. So why shouldn't we order a Franks hearing? I can't think of a legitimate reason for it. Because if you look at the standard, Your Honor, if you add, okay, assuming only for sake of argument that it was a material omission, if you add the material omission to the search warrant affidavit, was there still probable cause to issue a warrant for apartment 204? Yes. And, quite frankly, there was probable cause. It would cause into question the reliability of your informant, the dog, and it may very well have been done recklessly or in bad faith. So I frankly think you've got a problem here. But let's talk about just having the dog sniffing outside the doorway. How about the stethoscope hypothetical? Any difference? But it wasn't a stethoscope here. Why should it make a difference? Well, yeah, a stethoscope would be in violation of KILO because potentially that could be hearing inside the apartment legal activities. A dog sniffing does not detect legal activities in an apartment. It can't hear what's going on inside the apartment. It can't see what's going on inside the apartment. It is only smelling the emanating odor. So you want to extend the reasoning of Cabalas to the home? Yes, yes. Because, again, a dog can't see or hear what's going on inside the apartment. Well, a dog can hear some of those things. It just can't tell you. But we know, and I'll tell you what really troubles me here, is this idea of drawing a distinction between Jardine's front porch and the doorway of an apartment building. First, there's some pretty obvious class correlations between the levels of protection. And as I was trying to think about this, would it matter, for example, whether the hallway is enclosed? I'm trying to think about the difference between a row of Jardine apartments and not in the Seventh Circuit, but in southern parts of the United States, maybe there's an overhang over a common walkway with different homes. How is any of this different as a matter of constitutional law? Well, I think when you look at the done factors, if it was an enclosure and only that apartment tenant used that walkway for egress and ingress and it wasn't shared, then it's like a Jardine's. I mean, there are standalone apartments. There are standalone condos. If it's not a shared hallway, then it would be similar to Jardine's because that would be part of the curtilage. Why isn't this, I guess, picture gated communities, right, of standalone homes? Why isn't the landlord's permission to the police to go into the hallway sort of like somebody letting in the police into a gated community? You can go up and approach doors, but you're not entitled to have a dog sniff at the doors. Well, the law of the circuit has always been that common shared hallways don't have the same protection. It's not curtilage. When you look at the definition of curtilage, a landlord can dictate whether or not they can post Easter decorations on their door. A landlord can paint the door at any time, do anything it wants to the doorframe. The sanctities of his life in that apartment don't extend into the common hallway. Could the landlord say that you can have a party out in the hallway right outside Mr. Whitaker's door? I would say no. I would agree. It would be a disturbance to the other tenants because it's a shared hallway. For limited purposes. It's not curtilage. Not to camp out. He doesn't have exclusive control of that hallway. No tenant does. Again, the landlord controls everything in that hallway. Presumably it's the landlord who's vacuuming it, who's maintaining it. And again, in certain situations, a landlord can have, given proper notice, could take other people into an apartment, given the proper notice, to show the apartment to a prospective tenant. So I understand the distinction of private homeowner versus an apartment dweller. Maybe it does not have the same protections, but it's based on the definition of curtilage and the specific narrow holding of jardines. It was trespass. And here there was no trespass. Not only did the officers have the consent of the property manager to be in the building, but, again, it's a shared common hallway, which isn't curtilage. And so there was no trespass here. Do you think there was an invasion of privacy expectations? No. Why not? No. Again, because it's a shared common hallway and a dog sniffs but doesn't see. A dog sniffing does not detect any legal activities. So you disagree with the concurring justices in jardines? Yes. Okay. Yes. Because, again, the dog – I know what – I have a dog. I know they see things, but they can't communicate that. So it's very different than Kylo, Cats, and Jones. It's not detecting any private legal activities of the tenant. So in that sense, you're arguing that a dog, although a type of instrument to extend the sensory capabilities of the police, is sort of like the heat sensor. On the other hand, because it's not able to communicate verbally to the handler, it's different? No. The heat sensor could detect – I mean, when you – Yeah. Could detect lawful activity. But a dog standing outside a door, he's not – the dog, Hunter, he was not capable of seeing what Mr. Whittaker was doing in the apartment. He wasn't capable of hearing what Mr. Whittaker was doing in the apartment. He wasn't following him around the apartment like a GPS in Jones. So because the dog sniff does not detect any legal activities – That's back to Cabal's. Yeah. That is back to Cabal's. But you want to bring Cabal's home, in essence. And it's hard to understand, from that perspective, why Jardine was decided the way it was. I mean, that sounds like you're taking the view of the Jardine descent. No. Perfectly okay to bring the dog up to anybody's doorway. Well, the Jardine majority is saying you can't trespass. Not if it's trespass. And here it was not trespass because it's a common shared hallway. It was trespass only in a very artificial sense, though. Police are perfectly entitled to walk up and do a knock and talk. Yes. It was only the purpose that turned it into something improper under the Constitution as far as the Jardine majority was concerned. Correct. And you want us to say that that same purpose is perfectly okay outside an apartment door. Based on the holding of Jardine's? Absolutely, because it was based on the fact that they trespassed on The trespass is only because of the purpose, right? You don't want to interfere with police officers doing knock and talks, right? Right. That's perfectly okay. That was the holding of Jardine's, yes. Well, it's a trespass in the sense that they've gone on to somebody else's property, but it's not legally a trespass in the tort sense because there's an implied license. That's where the license theory comes in. Right. And so the court, at least the Justice Scalia opinion for the court, tries to reconcile the fact that the police walk onto your property, but you allow certain people to walk onto your property, whether it's guests coming to your house, or whether it's a police officer doing a knock and talk, or somebody delivering a newspaper in a limited license sense. Right. Which you're arguing isn't, you don't really get there in the common hallway of the apartment because everybody, because it's not his hallway anyway. It's the apartment building. Right. And that's what the law of this circuit has always held. And it was the law on the day they did this search. So even if this court finds under Jardine's that it was a trespass, under the good faith exception of Davis, because it was. The search here was after Jardine, right? It was. Yeah, it was after Jardine. But again, there was still a lot of cases here in the Senate circuit, which I have cited in my brief, that there's no expectation of privacy. Common hallways aren't curtilage. Before you run out of time, I want you to talk for a minute about 3624E. Because we have a conflict in the circuits on this point. The Ninth Circuit thinks that when it says a person is imprisoned in connection with a conviction, that there has to be a conviction. Right. And four other circuits think that when you look at the fact that the words any period are thrown in and some other things that it could be and after the fact conviction. So my question for you is, what about a person, suppose it's Mr. Whitaker and he's acquitted. So he's been in prison all this time. He's been detained all this time. After his supervised release term expired, he's acquitted. So there's no conviction. But he's been in prison. Doesn't that show that 3624E might be talking about a real conviction? I mean, the government's brief acts as though everybody who's tried winds up getting convicted. And obviously that's not our system or we wouldn't bother with trials. Right. But even this court held in Miranda, when somebody was civilly committed for two years under the Adam Walsh Act, that the term of supervised release told during that civil commitment of two years. But he was civilly committed. There was a reason to hold him. And I'm saying if somebody, if a statute is written in terms of imprisoned in connection with a conviction and there is no conviction, he's finished his supervised release for the earlier offense, he's being detained, he's tried, and the jury comes back with a unanimous verdict, not guilty, then I don't see how the statute works in that situation. Well, with your example, Your Honor, you said the term of supervised release did expire. It's exactly like, I'm trying to give you the hypothetical of Mr. Whittaker's case. Right. So his supervised release was going to be over, but they hold him because of the new charges, the 922G charges. And the 924C and the 841A. Right. So it was mandatory pre-trial detention. But again, only the Ninth Circuit has held that it has to be a sentence upon conviction. It's still a conflict in the circuit. It's the last I checked. It is. What if there was no detention but a later conviction? Ask it again, please. What if there was no detention but a later conviction? They weren't being held in connection with a conviction. They weren't being held at all. Then it wouldn't have been told because he wouldn't have been, he would have been serving. If he was out in the community, he would have been serving his term of supervised release. Well, he's still serving his term of supervised release, whether it's told or not, while he's incarcerated. Well, while he's incarcerated. He doesn't have to do monthly reports. He doesn't have to check in with his probation. Isn't that even more severe? Pardon me? Isn't that even more severe than supervision? Detention, absolutely. Pre-trial detention. Right. But, again, it was mandatory in this case because he was charged with a crime and he had violated the terms of his supervised release by dealing drugs, so the issue of detention. I agree with Judge Wood that this is a poorly written statute. I'm not saying that it's not poorly written. It's a problem. But the government has relied on cases that have interpreted it differently than the Ninth Circuit. They have been doing calisthenics to try to save this statute. I'm not sure that that's the right thing for a court to do. We don't write statutes. And Whitaker is arguing that his time in custody after his supervised release expired in July 2014 wasn't in connection with a conviction. He hadn't been convicted of anything. Right. Oh, I completely understand his argument. But, again, there are conflicting cases. So, of course, he's going to cite the cases that support his position. Yeah, but our job is to find the right answer, you know, and so that's. I know. The use of the word conviction in the statute seems to suggest that somebody is serving a sentence. I understand. And that that would toll the supervision. Right. But the government is entitled to rely on cases that support. There are other cases that have said it doesn't mean it has to be a sentence upon conviction. Pre-trial detention, it's just any term of imprisonment. There is a conflict. This court can resolve it how it sees fit. But it was the government's obligation. Does the choice of the verb imprisoned as opposed to detained or held in custody make a difference? No. Isn't someone imprisoned after a conviction as opposed to being detained pre-trial? No. He's still imprisoned under either scenario. He's in prison. Well, the Ninth Circuit said, and I believe this is common usage, that when we say we're sending somebody to prison, we mean he's been convicted after a trial and he's now going to go serve whatever period of incarceration he needs to serve, whereas we do talk about pre-trial detainees, other kinds of detainees. So there are contexts in which exactly the distinction Judge Darab was mentioning. You don't agree that the more logical construction of the statute would be that the statute is contemplating serving time after a conviction? You disagree with that construction, I take it? No, it's clearly how it's written. I understand that. Well, we have to construe it. There's a certain ambiguity. There's no question about that. And the courts have disagreed. I'm asking you, don't you agree that the more logical interpretation is that someone is in a prison because they've been convicted of a crime? It could be. I don't think my opinion matters. We don't send people to federal prisons until they've been convicted. We hold them in county jails or correctional centers and the like, right? I guess I view the term in prison just meaning you're not free. His liberty has been constrained greatly in any sort of correctional institution, whether it be a county jail or whatever. That's just how I view the term. But obviously courts disagree, people disagree. It is not a well-written statute, I agree. What are the stakes in that issue for this case? Pardon me? What are the stakes in that issue for this case? He only ended up getting an additional six months. She revoked, Judge Crabb revoked his term of supervised release. Six months sounds like a long time to spend in prison, but it's six months. He could have gotten the statutory max of two years, but she ordered some of it to be served concurrently to his current sentence, and so it really resulted in an extension of six months, which is a substantial period of time, but nowhere near the statutory max that he could have gotten. Okay. Well, thank you very much. Anything further, Mr. Eisenberg? Sure. You know, you were talking about the knock and talk, and in Jardines, the court said it's limited. It's not an unlimited time where you can sit there forever and wait for the person to do something. And I think that's the problem that we have here, is knock and talk versus bringing the dog is two different things. I also don't think Davis applies in this case. Number one, as Judge Hamilton indicated, this was after Jardines. And number two, I think Gutierrez gave this circuit and the law enforcement of this circuit direction about what really happens in that it's an implied license and you can't do the hallway thing like the officer thought he could. Finally, I really wanted to get into these records for a minute. I think that is so important in this case that just because the dog is certified doesn't mean the dog is reliable. And when you add in the affidavit that the dog was reliable 95% of the time and we don't have any way to challenge that other than I put the expert's affidavit in challenging the certification process and the dog's training, and I couldn't get the records, I think that's wrong. And Justice Kagan said we must have the opportunity to either, one, put our own expert in or cross-examine the dog handler, and we never got an opportunity to do any of that in this case. And I think I've made my point. I think Jardines does control here, but if it doesn't, I do request that you remand this back for a franks here. Thank you. All right, thank you very much. And you were appointed, were you not? I was. We appreciate your help to your client and to the court. Thanks very much. And thanks as well, Ms. Rombolo. We'll take the case under advisement.